[No. 1,047.]

## THE STATE OF NEVADA, RESPONDENT, *v.* AH CHEW, APPELLANT.

INDICTMENT—STATUTORY OFFENSE—NEGATIVE EXCEPTIONS.—In an indictment for a statutory offense, it is only necessary to state the negative to an exception to the statute, when the exception is such as to render the negative of it an essential part of the definition or description of the offense charged.

IDEM.—It is the nature of the exception, and not its locality, that determines the question whether it should be stated in the indictment or not.

OPIUM ACT—CONSTITUTIONALITY OF.—Section 1 of the Opium Act (Stat. 1877, 69) does not conflict with any of the provisions of the constitution of this State.

IDEM—RESTRICTION UPON SALES OF OPIUM.—Under the police power and in the interest of good morals, the good order and peace of society, for the prevention of crime, misery, and want, the legislature has authority to place such restrictions upon the sale or disposal of opium as will mitigate, if not suppress, its evils to society.

JURY LAW—FOURTEENTH AMENDMENT—TREATY WITH CHINA.—The jury law of this State does not conflict with the fourteenth amendment of the constitution of the United States, or with sections 1977, 1978, Rev.

Stat. U. S., or with article 6 of the treaty between the United States and China of July 28, 1868.

IDEM—RIGHT OF CITIZENSHIP—NOT CONFERRED UPON CHINAMEN.—The right of citizenship is not conferred by the amendments to the constitution of the United States, or the treaty between the United States and China, upon the Mongolian race, except such as are born within the United States.

IDEM—CITIZENS MAY BE EXCLUDED AS JURORS.—The privilege, or duty, of being a juror is not always an incident of citizenship.

IDEM—EQUAL PROTECTION TO PERSONS.—The State has the right to prescribe the qualifications of its jurors, provided it does not discriminate against persons because of their race or color. A mixed jury in a particular case is not essential to the equal protection of the law, and is not guaranteed by the fourteenth amendment to the constitution of the United States.

SUFFICIENCY OF EVIDENCE.—*Held,* that there was some evidence to sustain the verdict of the jury.

APPEAL from the District Court of the Sixth Judicial District, Eureka County.

The testimony in this case was, briefly, to the effect that Frank Connor, acting in concert with the officers of Eureka county, called at the defendant's house about two o'clock A. M., knocked at the door and woke up the defendant, and told him that he (Connor) was very sick and must have some opium. Defendant at first refused to get up, but after some threats upon the part of Connor, he got up. When he came to the door Connor handed him fifty cents and told him to go and get some opium. Defendant got the opium, gave it to Connor, and was thereafter immediately arrested by the sheriff.

*E. R. Garber* and *Alexander Wilson,* for Appellant:

I. The law under which the venire was issued is unconstitutional and void. (14th Amendment Constitution U. S.; secs. 1977, 1978, Rev. Stat. U. S.; Treaty with China July 28, 1868; *Strauder* v. *West Virginia,* 100 U. S. 303.) The civil rights of a Mongolian or yellow person are identical with those of an African, or black person, and are protected by the constitutional amendments and the acts of congress in relation thereto, in precisely the same manner as the rights of an African. The discrimination of our jury

law is against a person because of his race or color. The right which a state may claim, to restrict the jury list to citizens, is a right which can not be exercised when by its exercise persons of a peculiar race or color are in any way excluded from the full and equal benefit of all laws by reason of their race or color alone.

II. The effort of the legislature to regulate the sale and disposal of opium went beyond its power and transgressed the bounds of its authority. Since its discovery, opium has held its place in the commercial world as valuable property. Acknowledged to be so, it was entitled to and did receive the same protection and was accompanied by the attributes and incidents which pertain to all recognized subjects of property, and certainly comes within the protection of the provisions of the constitution, and it does not lie in the power of the legislature to condemn it, either directly or constructively, or to disturb an interest in it, or to pass any act the result of which diminishes or destroys its value. So long as opium is property, every incident necessary to perfect the right of property is conceded. The right of transfer or disposal is inseparable from this right. We can not imagine the right of property without the accompanying power of disposal. This act destroys the interest and value in all opium held in this state by others than druggists and apothecaries; and this is accomplished when the holder or owner is denied the right of disposal. (*Wynehamer* v. *The People*, 13 N. Y. 378; 1 Bl. Com. 138; 2 Kent's Com. 320, 326.)

III. The act impairs the obligation of a contract. Opium is exclusively an imported article, and the importer paying a duty to the United States for the privilege of importing it, there results a contract between the United States and the importer, that in consideration of the import duty, the United States agrees to, and guarantees to the importer, the right to use and dispose of his imported article in the usual manner of trade. No state legislature can nullify and set aside this right granted to the importer. In this case we see that the legislature has attempted to do this; and it is further found outside of its jurisdiction in this very matter,.

making an effort to regulate a branch of commerce, a prov-
ince peculiar and exclusive to the congress of the United
States.

IV. It is special legislation in the interest of a desig-
nated class, inasmuch as the sale of opium is restricted to
druggists and apothecaries, and they are given a monopoly
of the opium trade, to the exclusion of all the world.

V. The indictment is insufficient, and does not state an
offense, in this, that it does not show that the defendant
therein is not within the exception mentioned in the act.
(Whart. Am. Cr. L., sec. 379, and authorities there cited.)

*M. A. Murphy,* Attorney General, for Respondent.

By the Court, HAWLEY, J.:

Appellant was indicted, tried, and convicted of a felony
for a violation of section 1 of the "act to regulate the sale
or disposal of opium," etc. (Stat. 1877, 69.) This section
provides that "it shall be unlawful for any person or per-
sons, as principals or agents, to sell, give away, or other-
wise dispose of any opium in this state, except druggists
and apothecaries, and druggists and apothecaries shall sell
it only on the prescription of legally practicing physicians."
The charging part of the indictment reads as follows: "The
said defendant, Ah Chew, on the 30th day of April, A. D.
1880, or thereabouts, and before the finding of this indict-
ment, at the county of Eureka, in the state of Nevada, did
unlawfully and feloniously sell and dispose of opium, of the
value of fifty cents, United States silver coin, to one Frank
Connor, contrary to the form of the statute in such cases
made and provided, and against the peace and dignity of the
state of Nevada."

1. Appellant's counsel argue that this indictment does
not state an offense, because it does not show that the de-
fendant is not within the exceptions specified in the statute.
They claim the rule to be, that if there is an exception in the
enacting clause, the prosecution must negative the exception
and state in the indictment that the defendant is not within
it. The principle decided in *State* v. *Robey,* 8 Nev. 321, is
adverse to this rule.

There are cases cited in Wharton's Cr. L., secs. 378, 379, where the language employed would seem, at first blush, to sustain the position contended for by appellant. But from a careful examination of all the authorities upon this subject, we are of opinion that it is only necessary in an indictment for a statutory offense, to negative an exception to the statute, when that exception is such as to render the negative of it an essential part of the definition or description of the offense charged. It is the nature of the exception, and not its locality, that determines the question whether it should be stated in the indictment or not. The question is, as stated in *State* v. *Abbey*, "whether the exception is so incorporated with, and becomes a part of the enactment, as to constitute a part of the definition .or description of the offense; for it is immaterial whether the exception or proviso be contained in the enacting clause or section, or be introduced in a different manner. 'It is the nature of the exception, and not its location,' which determines the question. Neither does the question depend upon any distinction between the words 'provided' or 'except' as they may be used in the statute. In either case, the only inquiry arises, whether the matter excepted, or that which is contained in the proviso, is so incorporated with, as to become, in the manner above stated, a part of the enacting clause. If it is so incorporated, it should be negatived, otherwise it is a matter of defense." (29 Vt. 66.) (See also *Metzker* v. *People*, 14 Ill. 101; *Stanglein* v. *State*, 17 Ohio St. 461; *State* v. *Miller*, 24 Conn. 522; *State* v. *Glynn*, 34 N. H. 422; *State* v. *Wade*, Id. 491.)

The exception mentioned in section 1 does not define or qualify the offense created by the statute. The defendant can not complain that he has not been fully informed of the nature and cause of action against him. A *prima facie* case is stated in the indictment "in such manner as to enable a person of common understanding to know what is intended." (1 Comp. L. 1858.)

The question is one not only of pleading but of evidence, and where the exception need not be negatived it need not be proven by the prosecution. If the defendant was a

druggist, or an apothecary, and sold the opium upon the prescription of a legally practicing physician, it would be a defense.    These facts would be peculiarly within his knowledge, and could be established by him "without the least inconvenience, whereas if proof of the negative were required the inconvenience would be very great."    (1 Greenl. on Ev., Sec. 79.)

2. Section 1 of the statute above referred to does not conflict with any of the provisions of the constitution of this state.    It does not interfere with the existing rights of property.    It does not impair the obligation of any contract, and is not special legislation in the interest of a designated class.

It has universally been held to be the duty of every state to protect its citizens, and advance the safety, happiness, and prosperity of its people; and there is no doubt as to the power of the legislature to pass laws, like the one under consideration, designed to promote the health and protect the morals of the community at large.    Statutes to regulate the sale of intoxicating liquors; to prevent and prohibit their sale to minors, to Indians, to habitual drunkards; and to close saloons on the Sabbath and on election days, have been passed in many, if not all, of the states, and have always been upheld and sustained by the several state courts and by the supreme court of the United States.    (*License Cases*, 5 How. 504.)

It is not denied that the indiscriminate use of opium by smoking or otherwise tends in a much greater degree to demoralize the persons using it, to dull the moral senses, to foster vice and produce crime, than the sale of intoxicating drinks.    If such is its tendency, it should not have unrestrained license to produce such disastrous results.    A law prohibiting the indiscriminate traffic in this poisonous drug, and placing the trade under such regulations as to prevent abuses in its sale, violates no constitutional restraints.    Under the police power, recognized in the theory and asserted in the practice of every state in the union, in the interest of good morals, the good order and peace of society, for the prevention of crime, misery, and want, the leg-

islature has authority to place such restrictions upon the sale or disposal of opium as will mitigate if not suppress its evils to society.

*Wynehamer* v. *The People*, 13 N. Y. 378, upon which appellant relies, is not opposed to the views we have expressed. The decision in that case was based upon the ground that the act there under consideration confiscated and destroyed property lawfully acquired by the citizen in intoxicating liquors, and provided for its seizure and destruction without due process of law. The opinions of the various justices in that case expressly recognized the right of the legislature to regulate the sale and disposal of intoxicating liquors " upon such views of policy, of economy or morals, as may be addressed to its discretion." The subsequent decisions in that state have always recognized the right of the legislature to control and regulate the traffic in intoxicating drinks.

Wright, J., in delivering the opinion of the court in *Metropolitan Board of Excise* v. *Barrie*, upon this subject says: " The right to legislate on a subject so deeply affecting the public welfare and security has not heretofore been questioned or denied, and it could not well be, for it would have been to deny the powers of government inherent in every sovereignty to the extent of its dominions. A state is not sovereign without the power to regulate all its internal commerce as well as police. The legislature exercises and wields these sovereign police powers as it deems the public good to require. It is a bold assertion, at this day, that there is anything in the state or United States constitutions conflicting with or setting bounds upon the legislative discretion or action in directing how, when, and where a trade shall be conducted in articles intimately connected with the public morals or public safety or public prosperity; or, indeed, to prohibit and suppress such traffic altogether, if deemed essential to effect those great ends of good government. * * * Is it not an absurd proposition, that such a law, by its own mere force, deprives any person of his liberty or property within the meaning of the constitution, or that it infringes upon either of these secured private

rights? Yet this is the only ground its violators can occupy to raise any question as to its validity. They are restrained of no liberty, except that of violating the law, by engaging in a forbidden traffic; and the assumption is not even plausible that the act works a deprivation of property to any one." (34 N. Y. 666.)

The supreme court of Delaware, in *State* v. *Almond*, 2 Houston, 612, declared the act (for the suppression of intemperance) prohibiting the sale of intoxicating liquor 'for any other than "mechanical, chemical, and medicinal purposes only, and pure wines for sacramental use," to be constitutional.

The *Wynehamer case* was there elaborately reviewed, and it was shown that each of the justices who decided against the constitutionality of the prohibitory liquor law of New York based his opinion on grounds of objection that were not applicable to the Delaware act, and sustained the principle of restrictive legislation to the full extent required to support its validity. After an examination of many authorities upon the subject under consideration, we are prepared to reiterate and indorse the statement of Wright, J., in the opinion from which we have quoted, that: "No one heretofore has questioned, on constitutional grounds, the validity of such an enactment, or called upon the judiciary to declare it void, and, perhaps, would not at this time, except as emboldened by the inconsiderate *dicta* of some of the judges in the case of *Wynehamer* v. *The People*."

3. Appellant contends that the court erred in overruling his challenge to the panel of trial jurors, "because the law under which the venire was drawn is unconstitutional and void, in this: that it conflicts with the fourteenth amendment of the constitution of the United States, with sections 1977 and 1978 (Rev. Stat. U. S.), and article 6 of the treaty between the United States and China, of July 28, 1868.

This position is wholly untenable. It can not be maintained upon any sound reasoning, and is not supported by any authority. In construing the constitutional amendments and the civil rights bill, courts have always considered the history of the times when they were adopted, the

general objects sought to be accomplished, and the evils they were designed to remedy. Their object was to secure to the African the civil rights which the white persons of the United States enjoyed, and to give to that race the protection of the general government in that enjoyment whenever it should be denied by any state.

The amendments were primarily designed to give freedom to all persons of the African race within the United States, to prevent their future enslavement, to make them citizens, to prevent discrimination against their rights as freemen, and to secure to them the privileges of the ballot. The language used necessarily extends some of the provisions to all persons of every race and color; but their general purpose is so clearly in favor of the African race, that it would require a very strong case to make them applicable to any other. (*Slaughter-house Cases*, 16 Wall. 37; *Strauder* v. *West Virginia*, 100 U. S. 303; *Virginia* v. *Rives*, Id. 313; *Ex parte Virginia*, Id. 339.)

The amendments did not confer the right of citizenship upon the Mongolian race, except such as are born within the United States. The treaty between the United States and China did not confer upon the Chinese, coming to this country, the right of citizenship. The same section which guaranteed to the Chinese subjects certain "privileges, immunities, and exemptions in respect to travel or residence," contains the following proviso: "But nothing herein contained shall be held to confer naturalization upon * * * the subjects of China in the United States." (Section VI.)

The statute of this state provides that "every qualified elector of the state * * * is a qualified juror of the county in which he reside." (1 Comp. L. 1051.) This statute does not deprive appellant of any right secured to him by the constitution, laws, or treaty. The Mongolian or yellow race, to which appellant belongs, are denied the right to serve as jurors because they are aliens, and not on account of their color. There is no discrimination in the statute against any person because of his race or color.

Appellant had all the privileges guaranteed to the subjects of the most favored nation. He had the same rights

as an unnaturalized white person from England, Germany, or any other foreign country.   No greater rights could have been secured to him in the circuit court of the United States.   The qualification of jurors is the same in the United States courts as in the state courts.  (Rev. Stat. U. S., sec. 800; Stats. U. S., 1874–5, p. 336, sec. 4.)   The privilege, or duty, of being a juror is not always an incident of citizenship.   There are citizens of the United States that are in the respective states denied the right to sit as jurors in the trial of civil or criminal cases.

Women are citizens, but they are not, under the constitution and laws of this state, "qualified electors."   They have no right to vote or hold any office.   Yet they have the same right to a fair and impartial trial by jury as any other person.   Some of the states limit the age of male citizens who are declared competent to serve as jurors.   Yet it has never been held that a citizen over or under the prescribed age was denied any right secured to him by the constitution and laws of the United States.   All persons, whether male or female, old or young, citizens or aliens, white, black, or yellow, are equally protected in the right of trial by a fair and impartial jury, indifferently selected, without discrimination because of their race or color.

The statute of West Virginia, which was called in question in *Strauder* v. *West Virginia, supra*, reads as follows: "All *white* male persons, who are citizens of this state, shall be liable to serve as jurors."   The supreme court of the United States declared this law to be unconstitutional, because it singled out and expressly denied to the colored race "all right to participate in the administration of the law as jurors, *because of their color*, though they are citizens and may be in other respects fully qualified."

In the discussion of the questions there involved, the court expressly recognized the general principles we have announced, and declared, that every state has the right to prescribe the qualifications of its jurors, provided it does not discriminate against persons because of their race or color.   This is the language used: "We do not say that within the limits from which it is not excluded by the

amendment a state may not prescribe the qualifications of its jurors, and in so doing make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications. We do not believe the fourteenth amendment was ever intended to prohibit this. Looking at its history, it is clear that it had no such purpose. Its aim was against discrimination because of race or color. As we have said more than once, its design was to protect an emancipated race, and to strike down all possible legal discrimination against those who belong to it."

The argument that equal protection to persons can only be secured by allowing persons of the same race or color to act as jurors in cases affecting their interests, is fully answered by the supreme court of the United States in the case of *Virginia* v. *Rives, supra,* in reply to the application of two colored persons to have their cause removed from the state court to the circuit court of the United States. The statute of Virginia provided that all male citizens twenty-one years of age, and not over sixty, who are entitled to vote and hold office under the constitution and laws, are liable to serve as jurors. The law of that state, like the law of this state, did not discriminate against any person because of his race or color. Petitioners alleged that the grand jury that indicted them, and the petit jury that tried them, were composed wholly of the white race, and that no one of their race had ever been allowed to serve as jurors, in the county where they were tried, in any case in which a colored man was interested. The court say that these assertions "fall short of showing that any civil right was denied, or that there had been any discrimination against the defendants because of their color or race. The facts may have been as stated, and yet the jury which indicted them, and the panel summoned to try them, may have been impartially selected. Nor did the refusal of the court, and of the counsel for the prosecution, to allow a modification of the venire, by which one third of the jury, or a portion of it, should be composed of persons of the petitioners' own race, amount to any denial of a right se-

cured to them by any law providing for the equal civil rights of citizens of the United States. The privilege for which they moved, and which they also asked from the prosecution, was not a right given or secured to them or to any person, by the law of the state, or by any act of congress, or by the fourteenth amendment of the constitution. It is a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race and no discrimination against them because of their color. But this is a different thing from the right which it is asserted was denied to the petitioners by the state court, viz., a right to have the jury composed in part of colored men. A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia or by any federal statute. It is not, therefore, guaranteed by the fourteenth amendment or within the purview of section 641."

The question whether any person of the Mongolian race can become a naturalized citizen of the United States is not involved in this case, and does not, therefore, merit any discussion.

4. The evidence in this case was very slight and in some respects very unsatisfactory. But we are not prepared to say that there was no evidence to sustain the verdict of the jury.

The judgment of the district court is affirmed.